**FILED**

MAR 29 2018

CLERK, U.S. BANKRUPTCY COURT
WEST DIST. OF PENNSYLVANIA

## IN THE UNITED STATES BANKRUTPCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: : | Case No. 16-23901-GLT |
| : | Chapter 7 |
| **MAYA RESTAURANTS, INC.,** : | |
| : | |
| *Debtor.* : | |
| : | |
| : | |
| **ROSEMARY C. CRAWFORD,** : | Related to Dkt. No. 166 |
| : | |
| *Movant,* : | |
| : | |
| v. : | |
| : | |
| **PRASAD MARGABANDHU,**[1] *et al.,* : | |
| : | |
| *Respondents.* : | |

## MEMORANDUM OPINION

A chapter 7 trustee was nearly arrested on criminal charges for conducting a site inspection on property of the bankruptcy estate. The police and district attorney pursued the charges after receiving a complaint from Prasad Margabandhu, the owner of the chapter 7 debtor, Maya Restaurants, Inc. ("Maya"), identifying Rosemary Crawford as the perpetrator of a criminal trespass and burglary. But Mr. Margabandhu failed to tell the police that Maya was in bankruptcy and Ms. Crawford was serving as its chapter 7 trustee. The Court finds that Mr. Margabandhu's willful failure to disclose these material facts constituted an attempt to impede the trustee's administration of the bankruptcy estate. Although the criminal charges have since been withdrawn, the Court concludes that sanctions against Mr. Margabandhu are warranted to compensate the parties injured by his irresponsible conduct.

---

[1]    Mr. Margabandhu is also known as Prasad Bandhu. See In re JIYA Co., Case No. 17-23651, Audio Recording of Hearing Held in Courtroom A, November 7, 2017 at 10:23.24–40.

# I.

Maya petitioned for relief under chapter 11 of title 11 of the U.S. Code ("Bankruptcy Code") on October 18, 2016.  Its primary asset is a building located at 623 Long Run Road in McKeesport, Pennsylvania ("Premises").  Throughout its chapter 11 case, Maya was not an operational entity, nor did it produce any revenue.[2]  Mr. Margabandhu is Maya's president,[3] and he claims to be its "sole equity owner."[4]

A year earlier, water from an underground spring and a "casualty loss" scuttled Maya's plan to renovate the Premises into a restaurant and banquet hall.[5]  Maya intended to pursue two claims arising out of this incident.  It sought proceeds from an insurance policy to fund its restoration expenses[6] and claimed a valuable cause of action against the party from which it purchased the Premises—Festival Fun Parks, LLC—because the seller failed to disclose known drainage issues prior to the sale.[7]

From the beginning of the case, Maya demonstrated an inability to comply with basic bankruptcy requirements.  Within weeks of the filing, the U.S. Trustee filed a motion to dismiss the case because Maya had no general liability or property insurance in place to cover the

---

[2]    See Monthly Operating Reports, Dkt. Nos. 58–65; 96–99; 102, 104 (showing a lack of revenue).

[3]    Dkt. No. 16.

[4]    Dkt. No. 169, ¶ 6. The "List of Equity Security Holders" does not disclose the identity of any equity interests. Dkt. No. 16.

[5]    Dkt. No. 36; see also Audio Recording of Hearing Held in Courtroom A, March 23, 2017 ("March 23, 2017 Audio") at 11:55–11:56.

[6]    Dkt. No. 36.

[7]    Id.

Premises.[8] Maya also failed to file a single monthly operating report ("MOR") during the first six months of the case.

Due to Maya's inability to move the case forward, the Court established compulsory benchmarks that, if missed, could lead to dismissal.[9]  The Court also directed Maya to file a plan of reorganization by August 16, 2017.[10]  Maya partially complied with the Court's orders, but it failed to timely file a plan of reorganization.[11]

On September 29, 2017, the Court granted the U.S. Trustee's motion to convert the case to a chapter 7 proceeding.[12]  The Court found cause for conversion under 11 U.S.C. § 1112(b)(4)(J) because, after more than 300 days in bankruptcy, Maya had failed to make any discernible progress toward reorganization, and it was unlikely to confirm a plan within a reasonable time without a sustainable source of revenue.[13]  In reaching this determination, the Court observed a "history of noncompliance in this case" and "a lack of respect for the [bankruptcy] process."[14]

Maya filed a motion to reconsider the conversion order through a new attorney, Jeffrey Morris, who had not previously entered an appearance in the case or been approved as

---

[8]     Dkt. No. 21.

[9]     Dkt. Nos. 53, 67.

[10]    Dkt. No. 91.

[11]    See Dkt. Nos. 58–65, 72.

[12]    Dkt. No. 105.

[13]    Dkt. No. 105.

[14]    Sept. 28, 2017 Hearing Transcript, Dkt. No. 124 ("Sept. 28 Trans."), p. 6.  Among other things, the hearing revealed that postpetition real estate taxes remained unpaid, no progress was made on the claim against Festival Fun Parks, and Maya only filed its MORs when compelled to do so.  Sept. 28 Trans. at p. 8

counsel.[15] At the hearing, Maya claimed a prospective tenant was prepared to operate a Spanish

steakhouse on the first floor of the Premises based on a "letter of intent" signed just two days

before.[16] The tenant, a friend of Mr. Margabandhu,[17] represented that he had no previous

restaurant experience (indicating only that he runs a catering company)[18] but suggested the space

could be refurbished for only $1,000 in materials plus his own labor.[19] Mr. Margabandhu

concurred with this assessment and represented that a portion of the Premises could easily be

opened within a short time.[20] He also suggested that Maya's insurance claim was a "slam dunk"

and could be quickly resolved[21] because the insurer already "accepted liability" and made an initial

payment on the claim.[22]

  The Court ultimately denied the request for reconsideration after Mr. Margabandhu

revealed that he allows a woman (later identified to be Jonette Blazevich) to run a weekly bingo

game on the allegedly dormant Premises.[23] Although these events attract visitors to the site, Maya

---

[15] Dkt. No. 112; see also Audio Recording of Hearing Held in Courtroom A, Nov. 16, 2017 ("Nov. 16, 2017 Audio") at 10:47.46–10:47.54 (Mr. Morris: "At this point, Your Honor, you can say that I am here as a volunteer. I understand that I have not been retained as counsel. I understand the rules on that issue.").

[16] Id. at 10:12–10:13; see also Dkt. No. 134. Indeed, it appears Maya's counsel did not see the letter of intent prior to the hearing.

[17] Id. at 10:23.09–10:23.35.

[18] Id. at 10:23.38–10:24.32.

[19] Id. at 10:24.40–10:25.38.

[20] Id. at 10:22.15–10:22.48; 10:50.51–10:50.55 ("The portion that's nice can be easily fixed and operated.").

[21] Id. at 10:31.43–10:31.53; see also id. at 10:50.39–10:50.46 ("We are ready to go. My adjuster is ready to go. We just need to go down and have a meeting and have a hearing with them, and that's it.").

[22] Id. at 10:19.27–10:19.34. As to any final resolution, the parties remained $250,000 apart. Id. at 10:21.32–10:21.40. It appears that the insurer ceased providing coverage sometime after this claim arose. See supra note 8 and accompanying text.

[23] Nov. 16, 2017 Audio at 10:51.26–10:52.24.

does not receive revenue from these activities, nor does Ms. Blazevich pay rent.  Instead, Mr. Margabandhu suggests that Ms. Blazevich provides in-kind services and pays "some bills."[24]

Ms. Crawford was appointed to serve as the chapter 7 trustee on September 29, 2017, but she did not visit the Premises for nearly two months.[25]  On November 20, she contacted Attorney Morris and expressed her intent to inspect the Premises the following day.[26]  Although Attorney Morris attempted to tell Trustee Crawford that Mr. Margabandhu was unavailable on November 21, she did not receive his message.[27]  Instead, she called Attorney Morris at approximately 11:30 a.m. on November 21 and informed him that she was at the Premises, sought access to the building, and inquired as to Mr. Margabandhu's whereabouts.[28]  Thereafter, Attorney Morris contacted Mr. Margabandhu and requested that he meet the trustee.  Mr. Margabandhu claims he canceled an existing appointment and immediately headed to the Premises but was unable to get there by noon.[29]  While en route, Mr. Margabandhu encountered traffic and discontinued his trip to the Premises for some unexplained reason.

---

[24]     Id. at 10:51.39–10:51.47 ("She's not paying rent, but she's there.  She pays some bills but she helps out. Cleans the back, maintains the front.").  Mr. Margabandhu did not specify which bills Blazevich pays, other than to deny that she pays any of the utility bills.  Id. at 10:55.52–10:55.58 ("I've been paying the utility bills.").

[25]     Dkt. Nos. 106, 140, ¶ 6(a); see also Nov. 16, 2017 Audio at 10:46.28–10:46.32.

[26]     The record suggests that Trustee Crawford contacted Mr. Morris by both telephone and e-mail on November 20 to set up the site visit.  See Dkt. No. 155 (containing an e-mail from Trustee Crawford to Mr. Morris sent at 4:31 p.m. on November 20 indicating that she "would like to visit the premises tomorrow at 11 a.m.  Please let your client know to be available to let me in."); Dkt. No. 151 at ¶ 7 ("[T]he Trustee contacted Jeffrey T. Morris by telephone at approximately 5 PM on November 20, 2017 seeking to gain access to and inspect the Property at 11 AM on November 21, 2017, i.e. on less than 24 hours' notice.").

[27]     Dkt. Nos. 151, 155; see also Audio Recording of Hearing Held in Courtroom A, Dec. 21, 2017 ("Dec. 21, 2017 Audio") at 10:40.40–10:41.09.

[28]     Dkt. No. 151 at ¶ 7; Dec. 21, 2017 Audio at 10:41.20–10:41.33.

[29]     Dkt. No. 151 at ¶ 7; Dec. 21, 2017 Audio at 10:42.08–10:42.14 ("He's calling me, giving me updates as to his progress trying to get there and he's stuck in traffic.").  Trustee Crawford claims she had several discussions with Morris that day and was assured that Mr. Margabandhu would be there in "30 minutes." Id. at 10:32.25-10:32.34.

5

When Mr. Margabandhu failed to appear, Trustee Crawford hired a contractor to gain access to the Premises and change the locks.[30]  Upon entering the Premises, Trustee Crawford observed 12–14 fully operational video gaming terminals.[31]  None of the machines were listed on Maya's schedules.  Trustee Crawford also observed perishable food and alcohol that Maya claimed to be left over from a "birthday party" that occurred the night before.[32]

By 6 p.m. on November 21, Trustee Crawford filed a motion for sanctions ("*First Motion for Sanctions*") against Maya and Mr. Margabandhu, which detailed the existence of the video gaming terminals on the Premises.  Maya's former and current counsel were both given electronic notice of the *First Motion for Sanctions*.[33]

Later that night, Mr. Margabandhu arrived at the Premises after receiving a call from Ms. Blazevich reporting that "something happened" which prevented her from gaining access to the building.[34]  After entering the building through an "unlocked back door,"[35] Mr. Margabandhu claims he observed damage to the doors and noticed that several items were missing.

Mr. Margabandhu then contacted the City of McKeesport Police Department to report a burglary.  According to the criminal complaint, the police arrived at 1:20 a.m. on November 22 and took a report from Mr. Margabandhu and Ms. Blazevich.  Mr. Margabandhu

---

[30]    Dkt. No. 140 at ¶ 9; Dec. 21, 2017 Audio at 10:33.26–10:33.45.

[31]    Dkt. No. 140 at ¶ 6(b).  Attorney Morris identified them as "poker" machines.  Dec. 21, 2017 Audio at 10:44.08–10:44.21.

[32]    Dkt. No. 151 at ¶ 6.

[33]    Notice of Electronic Filing at Dkt. No. 140.

[34]    Feb. 1, 2018 Hearing Transcript, Dkt. No. 173 ("Feb. 1, 2018 Trans.") at 20:8–14.

[35]    The Court leaves for another day the question of whether Mr. Margabandhu's efforts to access the Premises after it was secured by the trustee (either on November 22 or on subsequent occasions) constituted a stay violation under 11 U.S.C. § 362.

later spoke with Attorney Morris, who told him that Trustee Crawford had been at the Premises earlier in the day.   Several days later, Mr. Margabandhu contacted the McKeesport Police to identify Ms. Crawford as the alleged perpetrator of the break-in.

The Court conducted a hearing on the *First Motion for Sanctions* on December 21, 2017.   During this hearing, Mr. Margabandhu was specifically advised that Trustee Crawford maintained possession over Maya's property and was entitled to control access to the Premises. At no time during the hearing did Mr. Margabandhu or Attorney Morris deem it necessary to inform the Court that a suspected burglary had occurred and a police report had been filed. Although the Court ultimately denied the *First Motion for Sanctions*,[36] the dismissal was without prejudice to the trustee pursuing relief under other statutory authorities.

In late January 2018, Mr. Margabandhu provided additional information to the McKeesport Police to bolster his claim that Ms. Crawford had entered the property without permission or knowledge.   But he omitted a critical fact.   He neglected to tell police that Ms. Crawford was serving as the chapter 7 trustee for Maya's bankruptcy estate.   Based on the information Mr. Margabandhu supplied, the McKeesport Police sought and obtained a warrant for Trustee Crawford's arrest on the charges of (i) criminal mischief, (ii) burglary, and (iii) criminal trespass.

On January 30, 2018, Trustee Crawford filed a new motion for sanctions ("*Second Motion for Sanctions*") against Mr. Margabandhu.[37]   She asserts that by withholding material information from the police, Mr. Margabandhu initiated a misguided prosecution that caused her

---

[36]   Dkt. No. 156.

[37]   See *Trustee's Motion to Compel and for Sanctions*, Dkt. No. 166.

to incur unnecessary time and expense to rectify.    Mr. Margabandhu filed a response in opposition.[38]

The Court conducted a hearing on the *Second Motion for Sanctions* on February 1, 2018.   During the hearing, Trustee Crawford's personal attorney reported that after being informed of the situation, the District Attorney's Office for Allegheny County, Pennsylvania had instructed the magistrate to withdraw the charges.   Accordingly, the criminal case has been dismissed and efforts are underway to vacate the arrest warrant and expunge the record.   Mr. Margabandhu also testified concerning the events which transpired in this matter.   At the conclusion of the hearing, the Court stated that it would impose sanctions against Mr. Margabandhu in consideration of the record before it.

This *Memorandum Opinion* contains the Court's findings of fact and conclusions of law with respect to the *Second Motion for Sanctions* and Mr. Margabandhu's response.   The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334, and this matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).

## II.

A federal court possesses inherent authority to impose sanctions for misconduct by those parties who appear before it.[39]   A bankruptcy court may channel its inherent authority by exercising power under section 105(a) to assess sanctions for behavior that is abusive to the judicial system.[40]   Pursuant to section 105(a), the court may "issue any order, process or judgment that is

---

[38]    Dkt. No. 169.

[39]    Goodyear Tire & Rubber Co. v. Haeger, 137 S. Ct. 1178, 1186 (2017); Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991).

[40]    See, e.g., Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc., 57 F.3d 1215, 1224 (3d Cir. 1995).

necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."[41]  To justify the

use of its inherent authority to impose a sanction, the Court must determine that the level of

misconduct constitutes bad faith and exceeds that which is merely inadvertent or negligent.[42]  Bad

faith conduct "implies the conscious doing of a wrong because of dishonest purpose or moral

obliquity."[43]

Before the Court may impose sanctions, it must consider two factors.[44]  The first is

why the conduct at issue warrants a sanction.[45]  As the Court of Appeals explained:

> Obviously, a pattern of wrongdoing may require a stiffer sanction
> than an isolated incident; a grave wrongdoing may compel a more
> severe sanction than might a minor infraction; and wrongdoing that
> actually prejudices the wrongdoer's opponent or hinders the
> administration of justice may demand a stronger response than
> wrongdoing that, through good fortune or diligence of court or
> counsel, fails to achieve its untoward object.  Furthermore, there
> may be mitigating factors that must be accounted for in shaping the
> court's response.[46]

Second, the Court must evaluate the range of permissible sanctions and explain why less severe

alternatives are either inadequate or inappropriate.[47]

Each bankruptcy debtor must satisfy certain fundamental duties.  Among those

obligations are the duties enumerated in section 521(a) to "cooperate with the trustee as necessary

---

[41]    11 U.S.C. § 105(a).

[42]    See Chambers, 501 U.S. at 49; In re Hill, 437 B.R. 503, 522–23 (Bankr. W.D. Pa. 2010).

[43]    In re Engel, 246 B.R. 784, 790 (Bankr. M.D. Pa. 2000).

[44]    See In re Bailey, 321 B.R. 169, 178 (Bankr. E.D. Pa. 2005); see also Republic of Philippines v. Westinghouse
Elec. Corp., 43 F.3d 65, 74 (3d Cir. 1994).

[45]    Republic of Philippines, 43 F.3d at 74.

[46]    Id.

[47]    Id.

to enable the trustee to perform the trustee's duties . . . [and] surrender to the trustee all property

of the estate."[48]   A debtor who fails to cooperate with a chapter 7 trustee may be sanctioned.[49]

Here, Mr. Margabandhu not only failed to cooperate but also acted to impair the trustee from

carrying out her duties to administer the bankruptcy estate.

   The Court finds no justification for Mr. Margabandhu's actions, and he had no

compelling reason to pursue the criminal complaint.   Before the police were summoned, Mr.

Margabandhu and his counsel were fully aware that it was Trustee Crawford, and not an unknown

culprit, who had gained access to the Premises on November 21.   Trustee Crawford filed the *First*

*Motion for Sanctions* earlier that evening and provided color photographs of the gaming machines

she discovered on the Premises.   Upon filing, the *First Motion for Sanctions* was served upon

Attorney Morris.[50]   Accordingly, there can be no doubt that when Mr. Margabandhu contacted the

police in the early hours of November 22, he had both actual and constructive notice that Trustee

Crawford had been on the property.[51]   The only factual dispute—whether the trustee provided

"adequate" notice of her visit—is immaterial.

---

[48]  11 U.S.C. § 521(a)(3), (4).

[49]  See, e.g., In re Paige, 365 B.R. 632, 638 (Bankr. N.D. Tex. 2007) (sanctioning the debtor for selling vehicles without the trustee's knowledge or consent); In re Cochener, 360 B.R. 542, 580 (Bankr. S.D. Tex. 2007) (observing that both a debtor and his counsel have a duty to cooperate with the trustee); In re Stinson, 269 B.R. 172, 176 (Bankr. S.D. Ohio 2001) (sanctioning the debtor for failing to provide the trustee with copies of her tax returns or turn over a tax refund); In re Pulliam, 2011 WL 1332040 at *4 (Bankr. D. Mont. Mar. 31, 2011) (sanctioning the debtor for attempting to transfer assets from a garage where the trustee was keeping them).

[50]  See supra n.33.   The record also suggests that a copy of the motion was sent to Mr. Margabandhu by mail on November 21. Dkt. No. 142.

[51]  Feb. 1, 2018 Trans. at p. 32 ("I think Ms. Crawford had the next day confirmed that she went inside by e-mail and pictures and a [motion for] sanction[s].")

Mr. Margabandhu's attorney suggests he had no legal duty to "call off the dogs."[52] Once the investigation began, Mr. Margabandhu claims the police controlled the outcome. But this rationale ignores the most egregious aspects of Mr. Margabandhu's conduct: (1) he knowingly withheld critical and material information from the police; (2) he failed to withdraw his police report once he was affirmatively told of Trustee Crawford's authority to access and secure the Premises; and (3) he inexplicably kept his concerns about the alleged property damage and pursuit of criminal remedies hidden from this Court. Each of these items would constitute bad faith on its own. Taken together, Mr. Margabandhu's conduct reveals a misguided effort to intimidate and influence the trustee. The Court will address each item in turn.

## A.

Mr. Margabandhu knowingly withheld material information that would have altered the course of the police investigation. Despite numerous communications with the police, he did not tell the investigating officer that Maya was in bankruptcy or that Trustee Crawford was attempting to access the Premises in her capacity as a chapter 7 trustee.[53] Instead, he expected them to discover these facts for themselves. He "presumed that people in McKeesport" knew of

---

[52]    Id. at p. 11:19.

[53]    Mr. Margabandhu's testimony is inconsistent as to scope of information provided to the police on Ms. Crawford's background. See Feb. 1, 2018 Trans. p. 22:6–13; 26:1–8; 26:23–27:5. To the extent he implies that police were told that Ms. Crawford was a trustee, the Court does not find this testimony to be credible. The criminal complaint authored by the police is devoid of any reference to a bankruptcy or Ms. Crawford's role as a chapter 7 trustee. Dkt. No. 181. It instead suggests that "Rosemary entered the property without permission or knowledge." Id. at 6. If Mr. Margabandhu identified Ms. Crawford as a trustee, the Court expects the police to include that material information in their report. The Court also notes that on three occasions, Mr. Margabandhu was asked whether he told police about Ms. Crawford's role as the chapter 7 trustee. In each instance, he failed to directly answer the question. As discussed later in this *Memorandum Opinion*, the Court finds that it can no longer rely on Mr. Margabandhu's testimony absent corroborating evidence.

the bankruptcy case[54] and speculated that information on Trustee Crawford's website could lead police to the conclusion that she was the bankruptcy trustee for the Premises.[55]

Disclosure of the trustee's role was a material fact because Ms. Crawford was acting in her official capacity when she entered the Premises.    As our Court of Appeals has recognized:

> The Chapter 7 trustee is created by Congress, appointed by and 'operating under the aegis of the U.S. Trustee,' and entrusted with the 'statutory duties . . . to gather and liquidate the property of the estate, to be accountable for the estate, ensure that the debtor performs his or her obligations,' and 'perform[ ] [other] adjudicatory and administrative functions.'[56]

Among her duties, a trustee must "secure and preserve estate assets, including changing the locks to a building when circumstances warrant."[57]    Similarly, the U.S. Trustee instructs chapter 7 trustees to obtain control over estate property:

> In those cases where the property appears to have value for the estate, the trustee must obtain control over the property, which may include changing the locks at the premises, hiring guards, etc.    The trustee also must immediately take all other steps which may be reasonably necessary to preserve the assets.[58]

Not only does the Court consider these missing facts to be determinative, but the McKeesport Police and district attorney seemingly agreed because they dropped the charges against Trustee Crawford shortly after the *Second Motion for Sanctions* was filed.

---

[54]    Feb. 1, 2018 Trans. at 26:11.

[55]    Id. at 26:1–8.

[56]    In re J & S Props., LLC, 872 F.3d 138, 143 (3d Cir. 2017) (citing In re Castillo, 297 F.3d 940, 950–51 (9th Cir. 2002)).

[57]    In re J & S Props., LLC, 545 B.R. 91, 113 (Bankr. W.D. Pa. 2015).

[58]    U.S. DEP'T OF JUSTICE, HANDBOOK FOR CHAPTER 7 TRUSTEES § 4.C.3.f (2012).

**B.**

Mr. Margabandhu also failed to rescind his police report once he knew that Trustee Crawford was entitled to access and secure the Premises.  To the extent that Mr. Margabandhu legitimately questioned Trustee Crawford's authority, his doubts were dispelled on December 21, 2017 when the Court instructed him on the trustee's duty to secure and control the Premises.[59] After that date, Mr. Margabandhu could not have reasonably believed that Trustee Crawford had committed a crime by entering the Premises:

> Q.   So coming out of that hearing on December 21st, did you have an understanding at that point that the trustee was entitled to secure and control the property?
>
> A.   At that hearing, yes.[60]

It is also noteworthy that, throughout this process, Mr. Margabandhu never consulted his own attorney to determine whether a criminal act had occurred.[61]

Instead of withdrawing the police report, Mr. Margabandhu doubled down.  On January 23, 2018, the police contacted Mr. Margabandhu seeking additional information.[62]  Rather than seizing an opportunity to clarify Trustee Crawford's role, he fanned the flames of the investigation by providing further details as to how Trustee Crawford "broke into the property" without permission and caused damage.[63]  He also provided an e-mail from Trustee Crawford to

---

[59]   Dec. 21, 2017 Audio at 10:55.30.

[60]   Feb. 1, 2018 Trans. at p. 28:24–29:2.

[61]   Id. at p. 34:23–35:3:

> Q.   [B]efore January 23rd when you told the police that Rosemary Crawford broke into the property without permission, before January 23rd, did you contact Mr. Morris about a break-in and whether or not it was a criminal act?
>
> A.   Not really, no.

[62]   Id. at p. 33:18–34:3.

[63]   Id.

13

establish that she had been on the Premises.[64]  Mr. Margabandhu now casts blame on the police

for not deciphering Trustee Crawford's role in the process:

> Q.   So after that [December 21, 2017] hearing, did you take any
> action to contact the police or other authorities and withdraw
> or rescind the complaint that you had filed or the
> investigation that you had started with those authorities?
>
> A.   No.
>
> Q.   And why is that?
>
> A.   They're the authorities.   I mean they can figure out what's
> allowed and what's not allowed.[65]

The police may not have known Trustee Crawford was legally authorized to enter the Premises,

but Mr. Margabandhu unquestionably did.  The continued pursuit of criminal charges under these

circumstances demonstrates a willful attempt to obstruct and delay the liquidation of estate assets

by endeavoring to have the trustee arrested under false pretenses.

## C.

Perhaps the most mystifying omission is Mr. Margabandhu's failure to alert the

Court of the suspected burglary and related damages.  Although Mr. Margabandhu would have

this Court believe that he honestly thought a crime was committed on November 21, he kept his

concerns about the alleged property damage and pursuit of criminal remedies a closely guarded

secret.  Even when the trustee detailed the circumstances of her site visit at the December 21

hearing and pursued sanctions against Mr. Margabandhu, he remained silent as to any purported

break-in.  When asked why he failed to mention the police report and perceived damage to the

Court, Mr. Margabandhu claimed it "had nothing to do with the hearing that day."[66]

---

[64]   Feb. 1, 2018 Trans. at p. 27.

[65]   Id. at 29:3–10.

[66]   Id. at 25:2–9:

14

A reasonable and rational debtor would have itemized the alleged damage and contacted the trustee (through his attorney) to alert her of its concerns. And to the extent a debtor seeks to press a tort law claim for property damage, he must first proceed in the bankruptcy court. Under the <u>Barton</u> doctrine, "a party must first obtain leave of the bankruptcy court before it brings an action in another forum against a bankruptcy trustee for acts done in the trustee's official capacity."[67] Because a bankruptcy trustee is deemed to be working for the court overseeing the bankruptcy proceeding,[68] the court has a strong interest in protecting her from "unjustified personal liability for acts taken within the scope of h[er] official duties."[69] In addition, a trustee enjoys qualified immunity from liability for civil damages provided that her conduct did not violate clearly established statutory or constitutional rights.[70]

Mr. Margabandhu took no such action. He did not have his attorney contact the trustee about his concerns, nor did he raise them with the Court when afforded the opportunity.[71] As this Court has the power to remove the trustee for cause under section 324(a), it certainly

---

| Q. | And is there a reason why you did not inform the Court at that time that you had made a police report? |

| A. | I think the goal of the hearing was to appeal the sanctions and just stay to the objective. |

| Q. | All right.   But is there a reason why you didn't feel it was necessary to tell the Court that you had contacted the police about a potential burglary? |

| A. | It had nothing to do with the hearing that day, so— |

[67]   <u>In re VistaCare Grp., LLC</u>, 678 F.3d 218, 232 (3d Cir. 2012) (citing <u>Barton v. Barbour</u>, 104 U.S. 126, 128–29 (1881)).  Although an exception exists under 28 U.S.C. §959(a) for acts or transactions of the trustee while conducting business activities, it does not apply here.

[68]   <u>Id</u>. at 230, 232 (The "trustee remains, for all intents and purposes, an officer of the bankruptcy court.")

[69]   <u>In re Lehal Realty Assocs.</u>, 101 F.3d 272, 276 (2d Cir. 1996).

[70]   <u>See</u> <u>J & S Props.</u>, 872 F.3d at 142–43 (citing <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).

[71]   Feb. 1, 2018 Trans. at p. 23:19–21; 24:4–7.

expects that any allegation of trustee misconduct would be brought to it first. Moreover, since this Court has the greatest interest of any judicial forum to ensure that estate assets are suitably preserved, it makes no sense for Mr. Margabandhu to pursue remedies elsewhere unless his intent was to hinder the trustee's efforts to liquidate the estate by purposely avoiding this forum.

### D.

Mr. Margabandhu contends he is immune from sanctions because his complaint to the police constitutes a protected activity under the Noerr–Pennington doctrine.[72] Established by the Supreme Court over 50 years ago,[73] the Noerr–Pennington doctrine originally provided immunity from antitrust liability to parties exercising their First Amendment right to petition the government for relief, irrespective of their motivation for doing so.[74] Recognizing that the "right of petition is one of the freedoms protected by the Bill of Rights," the Supreme Court determined that it could not "impute to Congress an intent to invade these freedoms."[75] The doctrine has since been expanded to protect "persons who petition all types of government entities—legislatures, administrative agencies, and courts."[76] Although Mr. Margabandhu cites no authority to suggest the doctrine extends to the present facts, the Court finds that even if it were applicable, it would not insulate Mr. Margabandhu from sanctions.

---

[72]    Dkt. No. 169 at ¶ 16.

[73]    Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 137–38 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 669–70 (1965)

[74]    Barnes Foundation v. Twp. of Lower Merion, 242 F.3d 151, 159 (3d Cir. 2001). Under the First Amendment, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.

[75]    Noerr, 365 U.S. at 138.

[76]    Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 123 (3d Cir. 1999); Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 160 (3d Cir. 1988).

Noerr–Pennington immunity is not unlimited.  Conduct which "is not genuinely aimed at procuring favorable government action" falls within the "sham" exception and is not worthy of protection under the doctrine.[77]  Immunity is therefore unavailable for those "who use the governmental *process*—as opposed to the *outcome* of that process" as a weapon.[78]  An action will qualify under the "sham" exception if it satisfies a two-part test.[79]  First, the action must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."[80]  If the action is objectively meritless, then the second part requires the Court to examine the subjective motivation of the petitioning party.[81]

Turning to the present facts, the Court finds that Mr. Margabandhu's police report falls squarely within the "sham" exception to Noerr–Pennington immunity.  His complaint that Trustee Crawford committed a trespass and illegally entered the property is "objectively baseless" by any measure.  As a chapter 7 trustee, Ms. Crawford is entitled to consolidate, preserve, and liquidate the assets in the Debtor's estate.[82]  With knowledge of these rights and privileges, any reasonable person would have concluded that she was acting within her lawful authority when she gained access to the Premises on November 21 and that she had not committed an illegal act.

The Court further finds that Mr. Margabandhu's continued pursuit of the criminal charges after December 21 was not a subjectively genuine use of government resources or an

---

[77]    Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 58 (1993).

[78]    City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380 (1991).

[79]    Prof'l Real Estate Inv'rs, 508 U.S. at 60.

[80]    Id.

[81]    Id; see also Pellegrino Food Prods. Co. v. City of Warren, 136 F. Supp. 2d 391, 413 (W.D. Pa. 2000).

[82]    11 U.S.C. § 704; see also, e.g., VistaCare Grp., 678 F.3d at 227; supra n. 57.

exercise of good faith. Mr. Margabandhu's efforts to incite a criminal investigation for what appears to be, at most, a claim for property damage and his failure to divulge those concerns at the December 21 hearing smack of an effort to circumvent this Court's jurisdiction. As Attorney Morris subsequently conceded, Mr. Margabandhu cannot challenge the trustee's ability to control the Premises—he can only assert a claim if provable damages were sustained.[83] Although criminal and civil law often overlap, Mr. Margabandhu sought only to punish Trustee Crawford for allegedly breaking in to the Premises rather than establish a claim for damages which would have necessitated the involvement of this Court.

The imposition of sanctions here is consistent with the Noerr–Pennington doctrine because the damages sustained by the injured parties arise out of Mr. Margabandhu's misguided conduct and are not attributable to a governmental action. The authorities withdrew the charges once they became aware of Ms. Crawford's role as the chapter 7 trustee, so no state action occurred, nor did any police involvement produce a discernible outcome. As Mr. Margabandhu's misrepresentations and lack of candor to the police are the exclusive reasons why the affected parties unnecessarily incurred fees and expenses to deal with the criminal charges, he cannot use Noerr–Pennington as a shield against sanctions.

## III.

The incident with the McKeesport Police highlights a persistent problem: Mr. Margabandhu's habitual lack of candor with this Court. On several occasions, the Court has been confronted with instances where Mr. Margabandhu failed to disclose material facts or provided misleading statements.

---

[83]    Feb. 1, 2018 Trans. at 18:11–14 ("I don't question her authority to control this property that was part of the estate and part of what she is to administer. I do not contest that at all. I think the execution here was not good on her part.")

Throughout this case, Maya made no mention of any activity occurring on the Premises. Then, at the end of the November 16 hearing, Mr. Margabandhu let it slip that Ms. Blazevich was conducting ongoing "bingo" games on site.[84] And until the trustee accessed the building, the Court was unaware that a dozen video gaming terminals had been installed. Moreover, Mr. Margabandhu initially reported that Ms. Blazevich paid no monetary consideration for the use of the Premises, but rather performed in-kind services and paid certain bills.[85] Later, Mr. Margabandhu testified that he personally pays Ms. Blazevich to look after the Premises, but none of those infusions are reflected on the MORs.[86]

Mr. Margabandhu also suggests property was either stolen or removed from the Premises on November 21, but he was unable to identify a single item with any specificity beyond the broad assertion that "stuff [was] taken out."[87] When pressed by the U.S. Trustee to describe the items, Mr. Margabandhu deflected the inquiry to Trustee Crawford and Ms. Blazevich instead.[88]

It is also unclear whether any type of illicit activity was occurring on the Premises.[89] Both Mr. Margabandhu and Ms. Blazevich vehemently deny that illegal gambling occurred

---

[84]    See supra n.23. Blazevich stated that she conducted at least five events on the Premises. Dec. 21, 2017 Audio 10:59.50–10:59.57.

[85]    See supra n.24. Ms. Blazevich's primary job duties are rather dubious. She is responsible for removing the trash (which could only be generated by her activities) and emptying large buckets of water. See Dec. 21, 2017 Audio 10:54.35–10:54.53; Dec. 21, 2017 Audio at 10:58.18; 11:00.54–11:01.02.

[86]    Feb. 1, 2018 Trans. at p. 30.

[87]    Id. at p. 22:24.

[88]    Id. at p. 30:17-21.

[89]    It is not within this Court's province to determine whether applicable nonbankruptcy law has been violated in this regard, but the testimony does raise some questions. See Dec. 21, 2017 Audio 10:59.19–10:59.40 ("A lot of my friends, they like to gamble, and instead of going down to the casino, they go there [to Maya].")

because there are no payouts on the video terminals.[90]  Still, they concede the terminals will not

operate without money.[91]  The suspicious nature of the activity is heightened by the fact that the

gaming terminals allegedly do not belong to Maya or Ms. Blazevich but rather, to a mysterious

figure known only as "Ray," who can only be contacted when he wants to be contacted.[92]

The occurrence of questionable and suspicious conduct are fast becoming the

hallmark of each bankruptcy case for which Mr. Margabandhu is associated.  By the Court's

estimation, Mr. Margabandhu is the principal officer for at least 12 corporate entities that have

petitioned for bankruptcy relief in this Court since 2011.[93]  Coincidental or not, circumstances are

emerging in these other cases suggesting a pattern of disregard for the law and disrespect to the

Court.

Recently, the Court was informed of potential illegal activity occurring on estate

property owned by another Margabandhu-related debtor.[94]  In connection with a criminal

investigation of an individual possessing a key to the debtor's property, law enforcement executed

a search warrant of the site and found more than 400 marijuana plants amid an extensive growing

---

[90]  Id. at 11:02.40–11:02.51 (denying gambling by Ms. Blazevich); id. at 10:53.56–10:54.18 (denying gambling by Mr. Margabandhu).

[91]  Id. at 11:03.23–11:03.50. But see id. at 11:02.49–11:02.50 (denying that individuals had to pay to play the machine).

[92]  See id. at 11:01.49–11:02.05.

[93]  See In re BS Burgers and Steaks Draft House, Inc., Case No. 11-24114 and Adv. No. 13-2002; In re PGH Real Estate Co., LLC, Case No. 11-25933; In re PDS Hotspot Corp., Case No. 12-20032; In re Maya Restaurants, Inc., Case No. 16-23901; In re MSAMN Corp., Case No. 17-23126; In re Kamakshi Inc., 12-21054; In re Bandu Development Inc., Case No. 16-20013; In re PGH Real Estate Experts LLC, Case No. 17-20835; In re Brownsville Berg Associates, Inc, Case No. 17-21785, refiled at Case No. 17-22123; In re PA Real Estate Development, Case No. 17-20833; In re City of Pittsburgh Property Development, Inc., Case No. 17-22729; and In re Jiya Co., Case No. 17-23651.  He is also affiliated with at least one other case, In re Glassport Hotspot LLC, Case No. 11-26292, which listed his brother, Sivram Bandhu, as the 100% owner but identified Jiya as a creditor.

[94]  See In re City of Pittsburgh Property Development, Inc., Case No. 17-22729; Dkt. No. 89.

operation, as well as a separate room for heroin and/or fentanyl bagging and distribution containing raw amounts of suspected heroin/fentanyl.[95]   The Court appointed a chapter 11 trustee when it became apparent that, similar to Maya, the debtor failed to generate any revenue, was unable to formulate a feasible plan of reorganization, and was unable to suitably protect the property.[96]

The Court also encountered at least two instances where Mr. Margabandhu shuffled property among his various entities in a shell game designed to frustrate creditor execution efforts. In one case, the Court granted *in rem* stay relief in favor of taxing authorities who entered into payment plan arrangements with one affiliate, only to discover that Mr. Margabandhu had subsequently transferred title to the affected properties to other entities.[97]   In another, a similar factual pattern prompted the Court to appoint a chapter 11 trustee.[98]

Given the totality of the circumstances, any credibility Mr. Margabandhu maintained with the Court is now depleted.   It no longer considers his statements reliable or trustworthy, nor will it rely on his testimony without independent verification.   Because Mr. Margabandhu has demonstrated a propensity for withholding material facts, the Court is fearful that estate property may be at risk in other cases.

## IV.

The type and form of civil sanctions a court may impose are varied.   It is therefore within the Court's discretion to fashion a remedy which is appropriate under the circumstances.[99]

---

[95]   See United States v. Rice, Case No. 17-1450, W.D. Pa. Dec. 13, 2017, Dkt. No. 16; see also *Affidavit in Support of Criminal Complaint*, Dkt. No. 1-1, ¶ 10.

[96]   In re City of Pittsburgh Property Development, Inc., Case No. 17-22729, Dkt. No. 90.

[97]   See id., Dkt. No. 69.

[98]   See In re Brownsville Berg Associates, Inc, Case No. 17-22123, Dkt. No. 82.

[99]   Chambers, 501 U.S. at 44–45; Latrobe Steel Co., v. United Steelworkers of America, AFL-CIO, 545 F.2d 1336, 1344 (3d Cir. 1976).

Among the available options, the Court may impose remedial sanctions to compensate an aggrieved party for damage caused by noncompliance, including reimbursement for legal fees and expenses incurred.[100]  In doing so, the Court may only shift fees to the extent they are directly attributable to the sanctioned conduct.[101]

Here, Mr. Margabandhu's misconduct obstructed Trustee Crawford's efforts to administer the bankruptcy estate, as she was under the threat of arrest for performing her statutory duties.  Due to Mr. Margabandhu's actions, Trustee Crawford, the U.S. Trustee, and the Court each expended unnecessary time and expense to rectify these matters.  Trustee Crawford was forced to retain a criminal attorney to defend against these ill-informed charges and will incur legal fees to ensure her record is completely expunged.  She also incurred fees to bring this matter to the Court's attention.  The U.S. Trustee was similarly compelled to take action.  Expenses which are wholly attributable to the willful and bad-faith conduct of Maya or its principal should not be borne by the bankruptcy estate, nor should they diminish the potential distribution to creditors.  Accordingly, the Court requires Mr. Margabandhu to reimburse Trustee Crawford for all reasonable fees and expenses incurred by her and her counsel to handle the criminal charges and the *Second Motion for Sanctions*; the Office of the U.S. Trustee for the value of the time spent by its employees to address this matter;[102] and the Clerk of the Bankruptcy Court for the time spent

---

[100]    See Chambers, 501 U.S. at 45; Robin Woods, Inc. v. Woods, 28 F.3d 396, 401 (3d Cir. 1994); see also In re Free, 466 B.R. 48, 60 (Bankr. W.D. Pa. 2012) (imposing a civil fine for the time spent by the trustee to investigate and establish the debtor's violations).

[101]    Goodyear Tire, 137 S. Ct. at 1186 ("Compensation for a wrong, after all, tracks the loss resulting from that wrong.")

[102]    Although the U.S. Trustee does not separately charge the estate for time spent overseeing the administration of various bankruptcy estates, the Court finds that in this instance, the U.S. Trustee was compelled to deploy resources on an expedited basis beyond those that might otherwise be required in a garden-variety chapter 7 case.  The added efforts were solely attributable to Mr. Margabandhu's incomplete disclosures to the McKeesport Police.

by his staff to facilitate the February 1, 2018 hearing.   Each of these sanctions is purely

compensatory because they reimburse the parties for time and expenses that otherwise would not

have been incurred absent Mr. Margabandhu's misconduct.

An appropriate Order will issue.

Dated:  March 29, 2018

_____
GREGORY L. TADDONIO
UNITED STATES BANKRUTPCY JUDGE

Case administrator to mail to:
Debtor
Jeffrey T. Morris, Esq.
Prasad Margabandhu
Rosemary C. Crawford, Esq.
Dennis Popojas, Esq.
Office of the U.S. Trustee

23